## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

Jeffery Burdick,

        Plaintiff,

  v.                                 Case No:

Total Quality Logistics, LLC

        Defendant.                /
_____

### COMPLAINT FOR DECLARATORY JUDGMENT

    Plaintiff Jeffery Burdick ("Burdick") for his Complaint against Defendant Total Quality Logistics, LLC ("TQL") states and alleges as follows:

### PARTIES, JURISDICTION & VENUE

    1.    Burdick is a former TQL employee who resides in, and is a citizen of, the state of Florida.

    2.    TQL is a limited liability company with its principal place of business located in Clermont County, Ohio. All of TQL's members are citizens of the state of Ohio.

    3.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are completely diverse and the amount-in-controversy exceeds $75,000.

    4.    Further, this Court has subject-matter jurisdiction over the action based on claims "arising under the Constitution, laws, or treatises of the United States," pursuant to 28 U.S.C. § 1331.

5.     Burdick brings this action seeking declaratory relief as to TQL's attempts to enforce certain restrictive covenants he was forced to sign as a condition of employment. Specifically, Burdick seeks a declaration that TQL's misclassification and unlawful withholding of overtime wages under the Fair Labor Standards Act ("FLSA") precludes TQL from enforcing his restrictive covenants. Therefore, jurisdiction is conferred upon this court pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), 28 U.S.C. § 1367, and 28 U.S.C. §§ 1331, 1337.

6.     Venue is appropriate here because Burdick was employed out of TQL's Tampa, Florida office, and in the restrictive covenant agreement at issue in this dispute, TQL consented to venue in "the United States District Court located in the jurisdiction where the office of Employee's employment is located."

## FACTS

I.     **TQL required Burdick to sign a one-year industry-wide non-compete.**

7.     TQL is in the transportation logistics industry. It provides shipping services, third-party logistics services, freight brokerage services, truck brokerage services, and assistance with supply-chain management across the continental United States. TQL is headquartered in Ohio and has offices in Daytona Beach, Ft. Lauderdale, Jacksonville, Orlando, and Tampa, Florida.

8.     TQL regularly hires individuals with no experience in the industry for entry-level sales positions and requires these new hires to participate in TQL's training program for six months before the individuals ("Trainees") are promoted to sales representative positions and allowed to earn commissions on sales they generate.

2

9.     TQL also requires new employees, including Trainees, to sign a Confidentiality Agreement and Restrictive Covenant, which purports to restrict them from working for any company in the industry for one year after their employment at TQL ends. It also restricts them from contacting *any* TQL customer or prospective customer for the same duration—regardless of whether the Trainee had any material contact with those customers or prospects.

10.    Burdick was hired by TQL as a Trainee in TQL's Tampa, Florida office. He was required to sign a Confidentiality Agreement and Restrictive Covenant ("Agreement") as a condition of his employment.

11.    Burdick's Agreement is attached to the Complaint as **Exhibit A**.

12.    The Agreement contains broad restrictive covenants, including the following customer/prospect non-solicitation provision that purports to apply to any TQL customer, regardless of whether Burdick ever had contact with such customers during his employment:

> During employment with TQL, and for a period of one (1) year immediately following termination of Employee' [sic] employment, whether voluntarily or involuntarily, by wrongful discharge or for any other reason whatsoever, Employee shall not (directly or indirectly, either as an individual on Employee's own account or as a partner, joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise on another's account) **contact, solicit or accept business from, render any services to, give assistance to, or accept any compensation from any Customer or customer prospect of TQL**. A customer prospect is any business, company, individual, partnership, or entity, including former Customers, **with which TQL or <u>any of its employees</u>, including but not limited to the Employee, had contact** for the purpose of soliciting business, developing a business relationship, or discussing existing or potential services of TQL within the twelve (12) months immediately preceding the Employee's termination or cessation of employment.

3

(Ex. A) (emphasis added).

13.     The Agreement also contains a one-year, industry wide non-compete provision:

> Further, Employee hereby agrees that Employee **shall not, directly or indirectly, enter into, participate in, consult with, or engage in, any business in competition with the business of TQL**, or with any Competing Business, as it now exists or may exist in the future, either as an individual or an Employee's own account, or as a partner, joint venture, employee, agent, salesman, contractor, officer, director, stockholder, or otherwise of another, for a period of one (1) year after the of the termination of Employee's employment with TQL.

(Ex. A) (emphasis added).

14.     Notably, the non-compete provision purports to prohibit Burdick from seeking employment in the transportation logistics industry "anywhere in the Continental United States."

15.     TQL required Burdick to sign the Agreement as part of his new hire paperwork. At the time he signed the Agreement, Burdick had no prior employment experience. Accordingly, the only customer Burdick brought with him to TQL was his father's company.

16.     Burdick did not understand or appreciate that the Agreement would prevent him from continuing his career as transportation logistics sales professionals if he ever left TQL.

17.     Burdick was not afforded an opportunity to negotiate the terms of the Agreement. It was presented to him by TQL as a take-it-or-leave-your-job Agreement.

18.     As stated in the Agreement, TQL would not employ Burdick unless he signed the Agreement. (Ex. A at 2.)

19.     Burdick was hired as a Trainee on December 3, 2019. After four months of working in TQL's Trainee program, Burdick became a Logistics Account Executive ("LAE"). He then took on a management position for one month; however, he quickly realized that the role required a considerable amount of extra work in exchange for no extra income.

**II.    TQL wrongfully withheld overtime pay from Burdick while he was a Trainee.**

20.     As a Trainee, Burdick was required to attend training sessions online and in a classroom. Additionally, Burdick was assigned to a seasoned LAE at TQL who was responsible for selling logistics services to customers. Burdick was required to complete tasks at the direction of his assigned LAE. Primarily, Burdick called truck drivers and carriers to ensure that a shipment his assigned LAE had booked was on track for delivery.

21.     Burdick, like all trainees, was required by TQL to work over 40 hours per week. Depending on the week, Burdick would work anywhere from 50 to 70 hours. He was often told to work through his lunchbreak, to work on Saturdays, and to prospect business after workhours.

22.     However, TQL did not pay Burdick any overtime pay as is required under the FLSA. Instead, TQL classified him as exempt under the FLSA and paid him approximately $37,000 (annualized salary) while he was a Trainee.

23.     TQL contends that Burdick is exempt from the requirements of the FLSA under the administrative exemption, 29 U.S.C. § 213(a)(1), which applies to employees

5

whose primary duty is the performance of office or non-manual work directly related to the management or general business operations and who exercise of discretion and independent judgment with respect to matters of significance.

24.     During his time as a Trainee, Burdick had no authority on behalf of TQL, and he did not exercise discretion or independent judgment with respect to matters of significance. Rather, he attended classes and performed administrative and operations tasks at an LAE's direction. He was told what to do, when to do it, and how to do it.

25.     Burdick was expected and required to assist the LAE with his or her accounts, which included covering freight, dispatching trucks, and making check calls. Generally, Burdick's day-to-day work with his assigned LAE consisted of hundreds of calls to carriers and truck operators to ensure that shipments were picked up, on track, and delivered.

26.     Burdick was expected to be available on call 24 hours a day, 7 days a week, 365 days a year. He was expected to work nights, weekends, and holidays.

27.     Burdick did not supervise two or more full time employees. He was not a manager or supervisor.

28.     Burdick did not have the ability to commit TQL to matters of significant financial impact.

29.     Burdick did not have the right or ability to create, implement or modify management policies.

30.     Burdick did not have the authority to hire or fire other employees, or offer suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees at TQL.

31.     Burdick did not have the ability to establish policies for TQL.

32.     Burdick did not have the ability to waive or deviate from established TQL policies.

33.     Burdick, at all times, was misclassified as exempt under the FLSA. Burdick should have been classified as non-exempt within the meaning of 29 U.S.C. § 203(e)(1).

34.     The legality of TQL's exempt classification of its Trainees has been called into question by many other TQL employees. Burdick is currently aware of three federal lawsuits wherein TQL trainees have alleged that TQL misclassified them as exempt in violation of the FLSA. *See Hendricks v. Total Quality Logistics, LLC*, 292 F.R.D. 529, 534 (S.D. Ohio 2013); *Hudgins v. Total Quality Logistics, LLC*, 16-CV-7331, 2019 WL 354958, at *1 (N.D. Ill. Jan. 29, 2019); *Daza v. Total Quality Logistics, LLC*, 8:13-CV-3259-T-30JSS, 2015 WL 5758164, at *1 (M.D. Fla. Sept. 29, 2015).

35.     In one such case, TQL settled the case for "full payment" of the overtime wages and liquidated damages to the lead plaintiff.  *Daza v. Total Quality Logistics, LLC*, (M.D. Fla. 2016) (No. 8:13-CV-3259-JSM-JSS), ECF No. 111 (Joint Motion to Approve Confidential Settlement at 2–3).

36.     Upon information and belief, TQL has been accused by many other former Trainees and employees of violating the FLSA in the form of complaints, arbitration demands, and demand letters. These repeated complaints have put TQL squarely on

notice that its pay practices violate the FLSA. Despite this, TQL has continued its unlawful practices with respect to Trainees.

37.     In fact, the United States Department of Labor investigated TQL's Tampa office and determined that TQL's payment of its Trainees violates the FLSA. TQL has continued its wrongful pay practices in spite of this finding by the DOL.

38.     Accordingly, TQL improperly withheld thousands of dollars in overtime wages from Burdick under the FLSA for his time as a Trainee. TQL's unlawful wage and hour practices as to Burdick precludes it from enforcing his restrictive covenants.

39.     Specific performance of a contract is a type of equitable relief, *see Taylor v. Fla. E. Coast Ry. Co.*, 54 Fla. 635, 646, 45 So. 574, 577 (1907), and one who seeks the aid of equity must do so with clean hands. *Pilafian v. Cherry*, 355 So. 2d 847, 849 (Fla. Dist. Ct. App. 1978). Florida law precludes specific performance of a contract by a plaintiff with unclean hands. *Tropic-Air Dev. Co. v. Rosen*, 248 So. 2d 537, 538 (Fla. Dist. Ct. App. 1971). Therefore, the doctrine of unclean hands is a defense to an employer's attempt to enforce a restrictive covenant through injunctive relief. *Bradley v. Health Coal., Inc.*, 687 So. 2d 329, 334 (Fla. Dist. Ct. App. 1997).

40.     By flagrantly violating the FLSA, TQL has unclean hands and should not be entitled to enforce the restrictive covenants in the Agreement.

**III.    TQL mistreated Burdick as a LAE by altering his commissions.**

41.     Burdick worked with a small set of customers after becoming a sales representative.

42.     In order to graduate from the Trainee position to become a LAE—where he could earn commissions—TQL required Burdick to meet certain prerequisites, including generating a certain amount of revenue, completing a certain amount of shipments, and activating five new customers independently.

43.     Upon information and belief, the majority of TQL Trainees never meet these requirements and are terminated within six to eight months of their hire.

44.     To meet these requirements, Burdick prospected and cold called new customers, while still assisting his assigned LAE and attending mandatory training sessions.

45.     Burdick met these requirements in February 2020 and then became an LAE.

46.     As an LAE, Burdick worked with a limited universe of customers. During his employment, Burdick worked with approximately 30 customers, whom he obtained almost entirely through cold calls. Only rarely was Burdick given a prospect by TQL to pursue.

47.     TQL did not provide Burdick with any existing customers that he could sell to. Rather, Burdick developed relationships with these customers without much, if any, assistance by TQL. TQL only provided Burdick with the names and phone numbers of customer "prospects" that Burdick could call. From there, it was entirely up to Burdick to generate business with these customers using general sales techniques, such as cold calling and emailing.

48.     Although he received commissions as a part of his payment structure as a an LAE, Burdick's commissions were altered during his employment. Originally, TQL gave Burdick a drayage commission of 20 to 25 percent; however, TQL unilaterally reduced that figure to 15 percent, which had a significant negative impact on Burdick's salary.

49.     If Burdick did not complete a shipment with a customer for 60 days, that customer would no longer be assigned to Burdick and another TQL employee could begin calling that customer regarding TQL's services.

50.     Upon information and belief, five to ten of Burdick's customers will cease doing business with TQL once Burdick leaves, regardless of whether Burdick contacts them on behalf of a new employer. His father's company, for instance, will continue to use Burdick regardless of where he goes.

51.     Customers in the industry do not work exclusively with only one logistics provider. They frequently use multiple logistics providers for their shipment needs over the course of a year. Customers regularly ask multiple logistics providers to quote the same shipment and select the provider based on price.

52.     Upon information and belief, all of Burdick's customers use multiple logistics providers.

**IV.    Burdick desires new employment but TQL aggressively enforces the Agreements against departing employees.**

53.    After becoming a LAE, Burdick remained grossly underpaid compared to the market. He has since resigned from TQL and has accepted employment with another company in the industry who has offered significantly better compensation.

54.    However, TQL aggressively enforces the restrictive covenants in the Agreement by seeking temporary restraining orders and injunctions. Accordingly, Burdick brings this action for a declaratory judgment stating that these restrictions are an unreasonable restraint of trade and are therefore unenforceable.

55.    Burdick is aware that TQL proudly holds itself out as "aggressively" enforcing restrictive covenants and routinely seeks equitable, injunctive relief.

56.    In seeking such equitable relief, TQL frequently points the Court to the extensive training that it provides its employees as justification for the sweeping restrictive covenants. However, TQL has no right to this equitable remedy because TQL has unclean hands due to its unconscionable employment practices requiring Burdick to work 50 to 70 hour work-weeks as a Trainee without paying any overtime, as is required under the FLSA and altering his commissions.

57.    By blatantly disregarding the statutory requirements of the FLSA, TQL has committed wrongdoing that concerns Burdick, is directly related to the matter in the litigation, and that personally injures Burdick.

58.     Further, the reason that Burdick seeks alternative employment is due to the under-market pay provided by TQL. The Court should not penalize him for leaving such a tainted workplace and seeking employment with another third-party logistics provider.

59.     Burdick will not be able to find alternative employment in the logistics industry unless his TQL Agreement is set aside. The Agreement impedes his ability to earn a livelihood, and renders him unemployable in the field.

60.     Upon information and belief, TQL has entered into no-hire agreements with other companies in the logistics industry, which further restricts Burdick's ability to find alternative employment. Burdick did not agree to any of these agreements between TQL and other logistics companies.

## V.     Burdick leaves TQL without any documents, confidential information,     or trade secrets.

61.     As entry-level sales employees, Burdick had no access to proprietary or sensitive business information that would be considered valuable to a competitor.

62.     He was not allowed to contact or work with TQL customers, and was not allowed to access information about TQL customers, unless those customers were specifically attributed to Burdick in TQL's software system.

63.     The majority of the information Burdick used at TQL to perform his sales job was provided directly by the customer, such as the commodity to be shipped, the pick-up and drop-off location, and the target rate.

64.     Further, customers regularly share prices from other logistics providers in an attempt to receive a more favorable bid.

65. TQL does not require its customers to maintain the confidentiality of any pricing information it provides to customers.

66. Burdick provided TQL with notice of his resignation on April 15, 2022. Upon departing, Burdick took affirmative steps to leave TQL in a professional manner. Burdick returned all TQL documents in his possession. He also deleted all electronic documents and files from his possession.

67. Burdick has no TQL documents or confidential information in his possession, and he has no intent to use TQL documents or information in his new employment. Burdick seeks only to use his general skills and knowledge of the industry.

## COUNT I – DECLARATORY JUDGMENT UNDER 28 U.S.C. § 2201 AND FLA. STAT. 86.021 THAT THE RESTRICTIVE COVENANTS ARE OVERBROAD, UNENFORCEABLE, AND ILLEGAL

68. Plaintiff repeats and realleges the preceding paragraphs as if fully set forth herein

69. A dispute exists regarding the enforceability of the restrictive covenants in the Agreement.

70. TQL's history of aggressive enforcement of its non-compete agreements with employees creates an actual controversy affecting Burdick's ability to ordinarily compete with TQL and earn a livelihood.

71. The legal rights, powers, and duties of the parties depend upon a declaration by this Court.

72. All parties with an interest in a declaration by this Court will have an opportunity to respond.

73.     Neither the controversy nor the facts upon which it is based are hypothetical. Additionally, the controversy is concrete and susceptible to conclusive judicial determination because a declaration regarding the enforceability of the non-compete provision would immediately clarify the parties' rights, powers, and duties.

74.     Plaintiff faces significant injury in the form of lost compensation due to TQL's position that Plaintiff is bound by the restrictive covenants and is prohibited from working for another third-party logistics provider.

75.     The restrictive covenants are unenforceable because TQL has no legitimate business interest in enforcing the restrictive covenants because there are no substantial customer relationships, trade secrets, or confidential information at risk here.

76.     Additionally, the restrictive covenants are overbroad in duration, geographic scope, and activity. For the period of an entire year in the entire continental United States, the Agreement seeks to preclude employment in a highly-transactional field in which customers frequently use multiple logistics companies at the same time, and commonly use logistics companies' bidding information to shop around. Each company uses its own method for developing bidding information, which turns heavily on the job requested by the customer. Accordingly, a one-year nationwide noncompete does not further any legitimate interest of TQL because no confidential information or substantial business relationship would be protected.

77.     Lastly, because TQL has wrongfully withheld overtime wages and commissions from Burdick, TQL has unclean hands and should be barred from enforcing the Agreement, including seeking equitable relief in the form of an injunction.

78.     Accordingly, Plaintiff seeks a declaration that the restrictive covenants are void, unlawful, and unenforceable under Florida law and that he is entitled to reasonable attorneys' fees and costs incurred by challenging the enforceability of the non-compete provision under Fla. Stat. § 542.335(1)(k).

## PRAYER FOR RELIEF

WHEREFORE, having stated Complaint, Plaintiff prays for relief as follows:

1.     That the Court grant a declaratory judgment declaring that the restrictive covenants in the Agreement are void, illegal, and unenforceable;

2.     That the Court issue temporary, preliminary, and permanent relief barring TQL from enforcing the restrictive covenants against Plaintiff;

3.     That the Court award Plaintiff his costs, disbursements, and attorneys' fees incurred in this action; and

4.     For such other and further relief as this Court deems just and proper.

Dated:  May 16, 2022

s/ Pamela Abbate-Dattilo
Pamela Abbate-Dattilo (MN #0389889)
Lukas Boehning (MN #0401165)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
*pabbatedattilo@fredlaw.com*
*lboehning@fredlaw.com*

*Attorneys for Plaintiff*